IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THOMAS H.,[1]   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| vs.   ) | Case No. 3:21-cv-1479-DWD |
| ) | |
| COMMISSIONER OF SOCIAL   ) | |
| SECURITY,   ) | |
| ) | |
| Defendant.   ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review of the final agency decision of Defendant, which denied Plaintiff's applications for Disability Insurance Benefits ("DIBs") and Supplemental Security Income ("SSI"). For the reasons explained below, the Court **AFFIRMS** the final agency decision of Defendant.

## I. Procedural History[2]

Plaintiff filed applications for DIBs and SSI on September 26, 2019, alleging a disability onset date of June 1, 2018. (Doc. 13-5, pg. 14). On March 5, 2020, Defendant issued Notices of Disapproved Claims. (Doc. 13-4, pgs. 2-11). Plaintiff requested, but was ultimately denied, reconsideration. (Doc. 13-4, pgs. 12-13, 17-22). Plaintiff then filed a Request for Hearing. (Doc. 13-4, pg. 23). After that hearing was held before an Administrative Law Judge ("ALJ") on April 27, 2021, an Unfavorable Decision was issued

---

[1] Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Plaintiff does not include the correct dates in this section of his brief.

to Plaintiff on May 6, 2021. (Doc. 13-2, pgs. 13-35). Plaintiff's Request for Review by the Appeals Council was denied on October 5, 2021. (Doc. 13-2, pgs. 2-7) As a result, Plaintiff exhausted his administrative remedies, and the ALJ's decision is final and ripe for review.

## II. The Evidentiary Record

Plaintiff was born on August 29, 1980, so he was 37 years old on the alleged disability onset date. (Doc. 13-2, pgs. 30, 44). He did not graduate from high school and does not have his GED. (Doc. 13-2, pg. 30). The alleged disability stems from diabetes, arthritis in the knees, hand cramps, hypertension, vision problems, high cholesterol, depression and anxiety, back pain, and neuropathy of the feet. (Doc. 13-3, pgs. 2, 5).

### A. Treatment and Prior Administrative Medical Findings

Plaintiff's primary care physician is Dr. Mahvish Zahoor, M.D. Between July 19, 2018, and January 28, 2021, Plaintiff presented to Dr. Zahoor on ten occasions, usually for a follow-up visit related to his diabetes and hypertension. (Doc. 13-7, pgs. 65, 85, 98, 144-45, 166-67, 260). During that time, Plaintiff's weight fluctuated between a low of 244 lbs (BMI of 33.09) on July 19, 2018, and a high of 269 lbs and 9.6 oz (BMI of 37.08) on January 28, 2021. (Doc. 13-7, pgs. 66, 262). Plaintiff's blood pressure also varied during those visits, reaching a high of 130/80 on July 19, 2018, and June 21, 2019, and a low of 124/60 on February 21, 2019. (Doc. 13-7, pgs. 66, 82, 99). On his last treatment date with Dr. Zahoor, January 28, 2021, Plaintiff's blood pressure was down to 126/74. (Doc. 13-7, pg. 262).

Plaintiff was consistently assessed by Dr. Zahoor as having Type 2 diabetes mellitus without complication or long-term use of insulin, hypertension, unspecified hyperlipidemia, and other diabetic neurological complications. (Doc. 13-7, pgs. 67, 71, 87,

97, 100, 147). Dr. Zahoor also assessed Plaintiff as having neuropathy and, on certain occasions, noted Plaintiff's knee and foot pain. (Doc. 13-7, pgs. 77, 87, 100, 145, 167).

On certain visits with Dr. Zahoor, Plaintiff was also assessed as having anxiety, shortness of breath, insomnia, depression, dizziness, and headache. (Doc. 13-7, pgs. 75, 77, 79, 81, 83, 87, 100, 169). In a treatment note from November 29, 2018, Dr. Zahoor stated:

> Pt reports he has been under a lot of stress lately and only gets about 4 hours a [*sic*] sleep a night. Pt reports his stress stems from being behind on bills, only just now finding a job after being unemployed for months, and family obligations. Pt has never been on anxiety medications before. He reports he has dealt with depression since he was 15 yos, but has not been treated with antidepressants.

(Doc. 13-7, pg. 73).

Plaintiff reported that he used marijuana and was compliant with his medications of Hydrochlorothiazide, Lisinopril, Lofibra, Glipizide, Sitagliptin, Pioglitazone, and Atorvastatin. (Doc. 13-7, pgs. 73, 87). Dr. Zahoor also prescribed Plaintiff Lexapro and Trazodone, which were reported as not strong enough. (Doc. 13-7, pg. 75). Plaintiff later received Januvia, Gabapentin, and Wellbutrin. (Doc. 13-7, pg. 87). Gabapentin was reported as not helpful to Plaintiff's pain. (Doc. 13-7, pg. 167). However, Plaintiff's anxiety and depression were responding to and helped by Wellbutrin. (Doc. 13-7, pg. 167).

Plaintiff presented to Marion Eye Center on November 14, 2018, and March 7, 2019, for "existing condition, diabetes." (Doc. 13-7, pgs. 10, 13). Plaintiff was noted as having high blood pressure. (Doc. 13-7, pgs. 10, 13). On each date, he reported no noticeable changes to visual acuity and "[s]everity [wa]s described as stable." (Doc. 13-7, pgs. 10, 13). Plaintiff had hypermetropia, regular astigmatism, refractive amblyopia, and

Type 2 diabetes mellitus without complications. (Doc. 13-7, pgs. 11, 13-14). With glasses, Plaintiff had a visual acuity of 20/40. (Doc. 13-7, pgs. 11, 14).

On January 3, 2020, Dr. Jonathan Thomas-Stagg, Ph.D., completed a mental status examination of Plaintiff. (Doc. 13-7, pg. 118). Dr. Thomas-Stagg considered Plaintiff's statements regarding his symptoms and level of functioning. (Doc. 13-7, pgs. 118-120). In terms of clinical observations, Dr. Thomas-Stagg noted as follows:

> The claimant was of average height and somewhat overweight...He was quite fidgety. The claimant related adequately well with the examiner. The claimant interrupted the examiner at times, most likely out of anxiety. The claimant was alert and oriented to person, place, and time. The claimant's mood appeared to be anxious. The claimant's affect was within normal limits in terms of range, intensity, and congruency. The claimant's speech was within normal limits in terms of rate, articulation, and prosody. The claimant was able to produce sustained, audible, and understandable speech. The claimant's content and process of thinking was within normal limits. There were no noticeable problems with gait, or evidence of fine-motor control difficulties. The claimant was able to walk without the assistance of an ambulatory device, and able to bear his own weight. The claimant's insight and judgment were fair for his age. The claimant's reliability as an informant was good.

(Doc. 13-7, pg. 120).

Further, Plaintiff answered various questions and completed an inference task, the serial sevens task, and paper-and-pencil tasks. (Doc. 13-7, pgs. 120-21). Given his age and education, Plaintiff performed within the expected range. (Doc. 13-7, pg. 121). He was diagnosed, by history, with depression and anxiety. (Doc. 13-7, pg. 121). Dr. Thomas-Stagg found: Plaintiff "was cooperative and responsive during the examination.... MSE results were within the expected range. He reported physical and health related problems

including diabetes, neuropathy, and back pain, as well as a history of depression and anxiety…. [He] appears capable of managing his own funds." (Doc. 13-7, pg. 121).

On January 14, 2020, Plaintiff was examined by an internist, Dr. Raymond Leung, M.D. (Doc. 13-7, pgs. 127-130). At that time, Plaintiff was 260 lbs and had a blood pressure of 132/83. (Doc. 13-7, pgs. 128, 130). Dr. Leung observed, with a BMI of 38.4, Plaintiff was obese. (Docs. 13-3, pg. 11; 13-7, pg. 128). Plaintiff was alert, oriented, cooperative, and had an intact memory and normal affect, dress, and hygiene. (Doc. 13-7, pg. 128). Dr. Leung believed Plaintiff could manage funds in his own interest. (Doc. 13-7, pg. 128). Further, with glasses, Plaintiff's visual acuity was identified as 20/70. (Doc. 13-7, pg. 130).

Dr. Leung noted Plaintiff had a mild limp, but he could walk unassisted for 50 feet. (Doc. 13-7, pg. 129). He could also tandem walk and hop, heel walk, toe walk, and squat. (Doc. 13-7, pg. 129). There was decreased range of motion in his lumbar spine, but no muscle atrophy or spasms. (Doc. 13-7, pg. 129). An x-ray of the lumbar spine showed no acute fracture, dislocation, destructive process, or spondylolysis or spondylolisthesis. (Doc. 13-7, pg. 132). There were diffuse spondylotic changes, but vertebral body heights and intervertebral disc spaces were unremarkable, pedicles and paraspinal soft tissue structures were normal, prevertebral soft tissue structures were unremarkable, and facet joints were normal. (Doc. 13-7, pg. 132). Straightening of the lumbar spine was secondary to muscle spasms or pain, and there was severe constipation. (Doc. 13-7, pg. 132).

Moreover, an x-ray of Plaintiff's thoracic spine indicated no acute fracture, dislocation, destructive process, or spondylolisthesis. (Doc. 13-7, pg. 133). There was thoracic spondylosis and disc degeneration, but vertebral body heights were well-

maintained, pedicles and paraspinal soft tissue structures were normal, and prevertebral soft tissue structures appeared unremarkable. (Doc. 13-7, pg. 133).

An x-ray of the right knee found mild soft tissue swelling but no acute fracture, dislocation, destructive process, significant osteoarthrosis, osseous erosive changes, or joint effusion. (Doc. 13-7, pg. 131). Plaintiff also had full range of motion in the knees. (Doc. 13-7, pg. 130). Further, Plaintiff's pinch, arm, and grip strength was 5/5, and he could oppose the thumb to finger in each hand. (Doc. 13-7, pg. 129).

Plaintiff's feet showed signs of neuropathy. (Doc. 13-7, pg. 130). He had a decreased sensation to pinprick, but the sensation to light touch was intact. (Doc. 13-7, pg. 129). Plaintiff had mild decreased vibratory sensation in his feet. (Doc. 13-7, pg. 129). Plaintiff's proprioception in the toes was normal and his cranial nerves were intact. (Doc. 13-7, pg. 129). Plaintiff's extremities displayed good distal pulses, and he had no lower extremity peripheral edema, ulcerative lesions, or varicosities. (Doc. 13-7, pg. 129).

Drs. Frank Mikell, M.D., and M.W. DiFonso, PsyD, rendered initial administrative medical findings in February 2020. (Doc. 13-3, pgs. 2-12). The impairments related to Plaintiff's back, diabetes, loss of vision, neuropathy, and hypertension were severe. (Doc. 13-3, pg. 5). Plaintiff's anxiety and obsessive-compulsive disorders were nonsevere. (Doc. 13-3, pg. 5). Dr. DiFonso found Plaintiff had mild limitations in the ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. (Doc. 13-3, pg. 6).

Dr. Mikell noted Plaintiff's symptoms were pain and limitations in understanding, remembering, concentrating, persisting, interacting socially, and adapting. (Doc. 13-3, pg.

7). Dr. Mikell concluded Plaintiff's statements about the intensity, persistence, and limiting effects of those symptoms were not substantiated by the objective medical evidence. (Doc. 13-3, pgs. 7-8). The longitudinal treatment records were most informative in assessing the consistency of the statements. (Doc. 13-3, pg. 8). Dr. Mikell found Plaintiff was "partially consistent," as there was evidence supporting medically determinable impairments but he was "not as disabled as originally claimed." (Doc. 13-3, pg. 8).

In terms of a Residual Functional Capacity ("RFC"), Dr. Mikell found Plaintiff could occasionally lift and/or carry 20 pounds, climb ramps and stairs, stoop, kneel, crouch, and crawl. (Doc. 13-3, pgs. 8-9). Dr. Mikell also found Plaintiff could frequently lift and/or carry 10 pounds, but he could never climb ladders, ropes, or scaffolds. (Doc. 13-3, pgs. 8-9). Dr. Mikell believed Plaintiff could stand and/or walk with normal breaks for a total of approximately 6 hours in a workday. (Doc. 13-3, pg. 8). With normal breaks, Plaintiff could also sit for about 6 hours in a workday. (Doc. 13-3, pg. 8). Plaintiff's ability to push and/or pull with his lower extremities was limited. (Doc. 13-3, pg. 8).

Dr. Mikell also found Plaintiff had visual, but not manipulative, limitations. (Doc. 13-3, pg. 9). He had limited near acuity, far acuity, and depth perception. (Doc. 13-3, pg. 9). With glasses, Plaintiff had a visual acuity of 20/70 in each eye. (Doc. 13-3, pg. 9). Therefore, Dr. Mikell opined that Plaintiff could perform a wide variety of tasks, including working with large and small objects. (Doc. 13-3, pg. 10). Plaintiff could have difficulty working in precise detail and viewing small objects. (Doc. 13-3, pg. 10). Plaintiff was not limited to unskilled work and, based on his RFC, he could perform certain light work. (Doc. 13-3, pgs. 11-12). Ultimately, Plaintiff was "not disabled." (Doc. 13-3, pg. 12).

In September 2020, in response to a request for activities of daily living, Plaintiff reported that his knees were "in severe pain," sometimes causing him to collapse. (Doc. 13-3, pg. 31). Plaintiff's back and knee pain was constant. (Doc. 13-3, pg. 31). He also experienced sharp needle pains in his feet, as well as arm pain that affected the use of his hands. (Doc. 13-3, pg. 31). Plaintiff struggled to sleep due to the pain. (Doc. 13-3, pg. 31). Plaintiff cared for his children, managed his personal care, and fixed simple meals. (Doc. 13-3, pg. 31). Plaintiff's children "mostly do the chores" due to his pain. (Doc. 13-3, pg. 31). Plaintiff still drove, shopped, and managed his money. (Doc. 13-3, pg. 31). Plaintiff occasionally visited a friend's house; otherwise, he left the house for appointments and to shop. (Doc. 13-3, pg. 31). Plaintiff could lift 20 lbs, but anything heavier caused pain. (Doc. 13-3, pg. 31). Plaintiff could stand "for a few minutes" but was "immediately in pain." (Doc. 13-3, pg. 31). Plaintiff could walk less than a block, but he did not use an assistive device. (Doc. 13-3, pg. 31). To manage his pain, Plaintiff alternated between standing and sitting. (Doc. 13-3, pg. 31). Plaintiff had trouble squatting, bending, reaching, kneeling, climbing stairs, and using his hands. (Doc. 13-3, pg. 31). He struggled to concentrate, manage stress and change, and get along with others. (Doc. 13-3, pg. 31). Plaintiff could follow instructions, and he had a visual acuity of 20/40. (Doc. 13-3, pg. 31).

Plaintiff was referred to an orthopedist by Dr. Zahoor. (Doc. 13-7, pg. 170). Plaintiff presented to Dr. Angela Freehill, M.D., of the Orthopaedic Center of Southern Illinois on October 2, 2020. (Doc. 13-7, pg. 183). Dr. Freehill noted Plaintiff had knee pain "for years" and could not find relief. (Doc. 13-7, pg. 183). Dr. Freehill also noted Plaintiff's uncontrolled diabetes and low back pain. (Doc. 13-7, pg. 183). On the date of service,

Plaintiff's pain was a 6 or 8 out of 10. (Doc. 13-7, pg. 183). That pain was "sharp, dull, throbbing, aching, stabbing, burning, [and] constant." (Doc. 13-7, pg. 183). Other symptoms involved Plaintiff's knees popping, grinding, locking, catching, and giving way. (Doc. 13-7, pg. 183). Standing, walking, lifting, exercising, twisting, bending, lying in bed, squatting, kneeling, climbing stairs, sitting, pushing, and pulling exacerbated those symptoms. (Doc. 13-7, pg. 183). Plaintiff was 250 lbs, resulting in a BMI of 33.9. (Doc. 13-7, pg. 183). Upon examination, Dr. Freehill noted as follows:

> Examination of patient's bilateral knees shows…no joint effusion. He is tender at the medial and lateral facets of the patella bilaterally. He lacks full active extension 15 degrees bilaterally and he has flexion 120 degrees. I can passively extended [*sic*] to full extension bilaterally, but he has extreme pain in the posterior hamstrings and the low back when I do this. He has no radicular symptoms when I do this.

(Doc. 13-7, pgs. 183).

Dr. Freehill obtained x-rays of Plaintiff's knees, noting "completely normal x-rays of the knees with no evidence of osteoarthritis, patellar tilt or patellar subluxation. His joint spaces are entirely preserved. These are 100% normal knee x-rays." (Doc. 13-7, pg. 184). Dr. Freehill also obtained an x-ray of the pelvis, noting Plaintiff has "significant bilateral acetabular dysplasia with 50% of uncoverage of bilateral femoral heads. He has minimal arthritis changes." (Doc. 13-7, pg. 184). Finally, Dr. Freehill obtained an x-ray of Plaintiff's lumbar spine, noting "[t]hese are essentially normal with a normal flexion and extension and no evidence of degenerative disc disease." (Doc. 13-7, pg. 184). Plaintiff was assessed as having "bilateral knee pain secondary to patellofemoral pain syndrome, tight hamstrings[,] and chronic low back pain." (Doc. 13-7, pg. 184). Dr. Freehill noted a

component of bilateral hip dysplasia, which caused external rotation of the femurs and malalignment syndrome. (Doc. 13-7, pg. 184). Plaintiff was recommended for physical therapy, referred to an endocrinologist, prescribed Meloxicam and Tramadol for his pain, and recommended for MRIs of the lumbar spine and left hip. (Doc. 13-7, pg. 184).

On October 14, 2020, Plaintiff presented to SSM Health St. Mary's in Centralia for physical therapy. (Doc. 13-7, pgs. 194-95). At the time of the visit, Plaintiff's pain in the hips and knees was a 7 out of 10. (Doc. 13-7, pg. 197). At worst, Plaintiff's pain was a 9 out of 10 and, at best, it was a 4 out of 10. (Doc. 13-7, pg. 197). Plaintiff's pain was aggravated by physical activity, twisting, turning, and lifting. (Doc. 13-7, pg. 197). He obtained relief by frequently changing position. (Doc. 13-7, pg. 197). Plaintiff noted "he feels stressed out and overwhelmed more recently than before." (Doc. 13-7, pg. 197). Plaintiff's posture was "deconditioned," and he stood "with severe B hip ER." (Doc. 13-7, pg. 197). Plaintiff had antalgic gait with decreased knee and hip flexion. (Doc. 13-7, pg. 197). He was tender to palpitation to "B hip and lumbar muscles." (Doc. 13-7, pg. 197). Plaintiff's joints were "decreased through spine and B hips." (Doc. 13-7, pg. 197). Plaintiff presented with signs and symptoms of congenital hip dysplasia. (Doc. 13-7, pg. 198). Physical therapy was recommended 2-3 times a week for 8 weeks. (Doc. 13-7, pg. 198).

Plaintiff presented for physical therapy on October 22 and 23, 2020, at which time he had generalized pain at a 6 out of 10. (Doc. 13-7, pgs. 233, 245). Plaintiff had a "fair" tolerance of that pain during treatment. (Doc. 13-7, pg. 233). He "performed exercises well with…cues to stay on task, focus, participate, and push himself." (Doc. 13-7, pg. 246).

In late-October 2020, on reconsideration of the initial administrative medical findings rendered in February 2020, Drs. Douglas Chang, M.D., Jerda M. Riley, M.D., and Richard J. Hamersma, Ph.D., rendered administrative medical findings related to Plaintiff. (Doc. 13-3, pgs. 26-42). Dr. Riley found Plaintiff's visual condition was nonsevere, imposing not more than a minimal impact on functioning. (Doc. 13-3, pgs. 34). It was noted that Plaintiff did not return to his treating eye doctor with visual complaints. (Doc. 13-3, pgs. 34, 39). Dr. Hamersma found Plaintiff's anxiety and obsessive-compulsive disorders, as well as depressive, bipolar, and related disorders, were nonsevere. (Doc. 13-3, pg. 35). He found the "paragraph B" criteria were the same as in the initial administrative medical findings. (Doc. 13-3, pg. 35). Plaintiff's dysfunction in major joints, diabetes mellitus, peripheral neuropathy, and hypertension were noted as severe. (Doc. 13-3, pg. 35). In a symptom evaluation, Dr. Chang found Plaintiff "remain[ed] partially credible. Extent of limitations alleged [wa]s not fully supported by the evidence." (Doc. 13-3, pg. 37). Dr. Chang found Plaintiff's RFC was substantially the same as in the initial administrative medical findings, except Dr. Chang found Plaintiff could stand and/or walk for only 2 hours in a workday with normal breaks. (Doc. 13-3, pg. 38). Plaintiff was not limited to unskilled work but, based on his RFC, he could perform only sedentary work. (Doc. 13-3, pg. 41). Accordingly, Plaintiff was "not disabled." (Doc. 13-3, pg. 42).

Plaintiff continued physical therapy in October and November 2020. On October 28, 2020, Plaintiff indicated he continued to have back and knee pain, described as a 6 out of 10 in his back and 5 out of 10 in his knees. (Doc. 13-7, pg. 314). Plaintiff did not believe physical therapy helped. (Doc. 13-7, pg. 314). On November 2, 2020, Plaintiff reported

that he had some pain in his back and knees. (Doc. 13-7, pg. 311). Pain in the right knee was a 7 out of 10 and pain in the left knee was a 5 out of 10. (Doc. 13-7, pg. 311). Despite some pain, Plaintiff tolerated the treatment well. (Doc. 13-7, pg. 312). The next day, November 3, 2020, Plaintiff noted constant pain in his knees and back. (Doc. 13-7, pg. 308). Plaintiff's pain in the right knee was an 8 out of 10, pain in the left knee was a 6 out of 10, and pain in the hips was a 6 out of 10. (Doc. 13-7, pg. 308). Despite some pain in his knees, Plaintiff fairly tolerated the treatment. (Doc. 13-7, pg. 309).

On November 17, 2020, Plaintiff reported his right knee was buckling and popping occasionally, which was painful. (Doc. 13-7, pg. 305). Plaintiff's pain was rated as an 8 out of 10. (Doc. 13-7, pg. 305). Despite the pain, he tolerated treatment well. (Doc. 13-7, pg. 306). Plaintiff's response to treatment was "positive." (Doc. 13-7, pg. 306). On November 25, 2020, Plaintiff "report[ed] no change[] but maybe worsening pain since starting therapy." (Doc. 13-7, pg. 300). Plaintiff's pain had never been in his hips, but now that pain was consistent with his knee and back pain. (Doc. 13-7, pg. 300). Plaintiff could sit or stand for 10 to 20 minutes before needing to "do the opposite to get [the] pain to decrease." (Doc. 13-7, pg. 300). Plaintiff's knee and back pain was an 8 out of 10. (Doc. 13-7, pg. 300). During the prior week, Plaintiff's pain, at best, was a 5 out of 10 and, at worst, was a 10 out of 10. (Doc. 13-7, pg. 300). Plaintiff's gait was unchanged. (Doc. 13-7, pg. 300). The records note he "attended 9 sessions of physical therapy in 6 weeks," despite a referral for 2-3 times a week for 8 weeks. (Doc. 13-7, pg. 300). Plaintiff canceled most visits due to lack of money for fuel. (Doc. 13-7, pg. 300). Plaintiff improved his lower extremity

strength. (Doc. 13-7, pg. 300). However, he was "unchanged according to subjective." (Doc. 13-7, pg. 300). Plaintiff's progress was "poor." (Doc. 13-7, pg. 303).

On December 1, 2020, Plaintiff returned to Dr. Freehill at the Orthopaedic Center of Southern Illinois. (Doc. 13-7, pg. 284). Plaintiff weighed 250 lbs, resulting in a BMI of 33.9. (Doc. 13-7, pg. 284). Dr. Freehill noted Plaintiff had knee pain secondary to patellofemoral pain syndrome, tight hamstrings, and chronic low back pain. (Doc. 13-7, pg. 284). Plaintiff also had malalignment syndrome due to severe external rotation of his hips. (Doc. 13-7, pg. 284). At the time of the visit, Plaintiff had tenderness at the patellofemoral joint and numbness and tingling in the ulnar three fingers, the latter of which was "possibly related to his uncontrolled diabetes." (Doc. 13-7, pg. 284). Plaintiff's pain was a 6 or 7 out of 10 in both his knees and back. (Doc. 13-7, pg. 284). He was not experiencing hip pain. (Doc. 13-7, pg. 284). Dr. Freehill indicated an MRI of the lumbar spine was ordered but denied by insurance. (Doc. 13-7, pg. 284). Further, she instructed Plaintiff to obtain a referral for an endocrinologist for his uncontrolled diabetes, but Plaintiff had not done so. (Doc. 13-7, pg. 284). X-rays of Plaintiff's pelvis indicated he had bilateral acetabular dysplasia with greater than 40% of bilateral femoral heads uncovered. (Doc. 13-7, pg. 284). X-rays of Plaintiff's lumbar spine were normal and did not show degenerative disc disease. (Doc. 13-7, pg. 284). Plaintiff was assessed as having lower extremity pain and chronic low back pain, and he failed conservative treatment by physical therapy and anti-inflammatories. (Doc. 13-7, pg. 284). Dr. Freehill opined that Plaintiff "likely [has] a herniated disc or some lumbar spinal canal stenosis[,] which is not evident on x-ray." (Doc. 13-7, pg. 284). She recommended a referral to an endocrinologist

13

for management of uncontrolled diabetes, an MRI of the lumbar spine, and an EMG nerve conduction study of the right upper extremity. (Doc. 13-7, pg. 284).

On March 2, 2021, Plaintiff again presented to Dr. Freehill at the Orthopaedic Center of Southern Illinois for a follow-up to an MRI. (Doc. 13-7, pg. 281). Plaintiff weighed 255 lbs, resulting in a BMI of 34.6. (Doc. 13-7, pg. 281). Dr. Freehill noted Plaintiff had knee pain secondary to patellofemoral pain syndrome, tight hamstrings, and chronic low back pain. (Doc. 13-7, pg. 281). Plaintiff also had malalignment syndrome due to severe external rotation of his hips. (Doc. 13-7, pg. 281). Dr. Freehill noted she requested an endocrinologist referral, but that it was still not completed. (Doc. 13-7, pg. 281). Further, a nerve conduction study of the right upper extremity was ordered, but Plaintiff missed the appointment. (Doc. 13-7, pg. 281). Plaintiff's knee pain was a 6 or 7 out of 10 and his back pain was an 8 out of 10. (Doc. 13-7, pg. 281). Plaintiff was tender at the patellofemoral joints and the midline of the back. (Doc. 13-7, pg. 281). An MRI showed no obvious herniated disc, but Plaintiff had foraminal narrowing at the L3-L4 and L4-L5 levels due to short pedicles and bulging discs. (Doc. 13-7, pg. 281). Plaintiff was assessed as having knee pain and malalignment syndrome, as well as chronic low back pain due to mild canal stenosis and foraminal narrowing. (Doc. 13-7, pg. 281). Plaintiff was referred to pain management. (Doc. 13-7, pg. 281). Dr. Freehill still believed an endocrinologist was necessary in order to manage Plaintiff's diabetes. (Doc. 13-7, pg. 281).

Plaintiff returned to the Orthopaedic Center of Southern Illinois, complaining of low back pain, on March 11, 2021. (Doc. 13-7, pg. 277). He indicated physical therapy worsened the low back pain, and over-the-counter medication had not helped. (Doc. 13-

7, pg. 277). Plaintiff reported that the pain did not radiate to the legs, and he did not have any numbness or tingling. (Doc. 13-7, pg. 277). The pain was a 6 to 10 out of 10, depending on Plaintiff's activity. (Doc. 13-7, pg. 277). The pain was sharp, dull, stabbing, burning, throbbing, and constant. (Doc. 13-7, pg. 277). Plaintiff reported numbness, tingling, popping, grinding, weakness, locking, catching, giving way, and instability. (Doc. 13-7, pg. 277). Bending, walking, standing, sitting, and lying down worsened the pain. (Doc. 13-7, pg. 277). Plaintiff was 250 lbs, resulting in a BMI of 33.9. (Doc. 13-7, pg. 277).

Psychologically, Plaintiff showed "mild pain magnification behavior," but was otherwise pleasant and oriented to time, place, and person. (Doc. 13-7, pg. 277). Neurologically, no weakness was noted. (Doc. 13-7, pg. 277). Relating to the lumbar spine, Plaintiff had tenderness with palpitation. (Doc. 13-7, pg. 277). He had forward flexion to the floor with an increase in back pain, a lumbar extension to 15 degrees with a significant increase of axial back pain, and a negative hyperextension test bilaterally with back pain. (Doc. 13-7, pg. 277). X-rays were conducted of the lumbar spine and pelvis. (Doc. 13-7, pg. 278). Disc heights were fairly well maintained and there was normal lumbar lordosis, mild facet arthritis, and no evidence of fracture. (Doc. 13-7, pg. 278). It was noted that an MRI of the lumbar spine was conducted on December 11, 2020, which revealed as follows:

> There is mild right L3-4 neural foraminal narrowing with congenitally shortened pedicles. There is mild L5-S1 bulging disc asymmetric to the right with congenitally shortened pedicles. There is no evidence of fracture or significant disc herniation or bulge. There is facet arthritis throughout the lumbar spine. The disc heights are fairly well maintained.

(Doc. 13-7, pg. 278).

Plaintiff was assessed as having low back pain with facet arthritis. (Doc. 13-7, pg. 278). Surgical intervention was not necessary. (Doc. 13-7, pg. 278).

On April 8, 2021, Dr. Sajjan Nemani, M.D., completed a Report of Nerve Conduction Study and EMG. (Doc. 13-7, pg. 295). The Report supported a diagnosis for moderate ulnar neuropathy at the elbow with "[n]o denervation changes but mild to moderate decreased recruitment…in ulnar innervated muscles in forearm or hand." (Doc. 13-7, pg. 285). The report also supported a diagnosis for mild right carpal tunnel syndrome, "suggestive of conduction slowing[] [but] [n]o denervation changes…in Abductor Pollicis Brevis." (Doc. 13-7, pg. 295). Finally, there was a possibility of mild diffuse sensory polyneuropathy of axonal type, as seen with diabetes. (Doc. 13-7, pg. 295).

### B. The Administrative Hearing

A hearing was held by an ALJ on April 27, 2021. (Doc. 13-2, pg. 36).[3] Plaintiff testified that he did not have a sudden traumatic injury; rather, his chronic conditions worsened over time. (Doc. 13-2, pg. 46). Plaintiff complained of his back, right arm, knees, and feet. (Doc. 13-2, pgs. 58-59). Plaintiff's back had "always been an issue," but he only recently realized something was "severely wrong." (Doc. 13-2, pg. 46). Plaintiff's back was in "constant pain" and "way worse than it ever was." (Doc. 13-2, pgs. 58-59). Plaintiff stated there are times when it is difficult for him to "even get up and do anything." (Doc. 13-2, pg. 59). His back locks up and gets really tight. (Doc. 13-2, pg. 59). Plaintiff indicated sometimes he cannot bend over due to his back pain. (Doc. 13-2, pg. 59). The back pain

---

[3] At the start of the hearing, Plaintiff's attorney indicated the record was complete, such that he was not aware of any additional evidence relating to the disability issue. (Doc. 13-2, pgs. 40, 79).

also makes it difficult to sit up and sit down. (Doc. 13-2, pg. 59). Plaintiff also noted, when cooking, he cannot stand for too long because his back gets tight. (Doc. 13-2, pg. 59). Plaintiff rated his back pain as an 8 out of 10, which is typical. (Doc. 13-2, pg. 60). "Trying to do anything," such as going to the kitchen to cook, going up or down stairs, walking around a store, or sitting too long, worsens the back pain. (Doc. 13-2, pg. 60). Usually, Plaintiff can sit for around 30 minutes before the back pain requires him to stand. (Doc. 13-2, pg. 60). Marijuana has helped Plaintiff manage the back pain. (Doc. 13-2, pg. 71).

Plaintiff also testified that his knees are in "constant pain" and "just keep getting worse," such that it is difficult "to do anything that I need to do." (Doc. 13-2, pgs. 58-59). The knee pain, which takes his breath away when going up stairs, is a burning sensation. (Doc. 13-2, pg. 61). Plaintiff's knees also begin to hurt when sitting. (Doc. 13-2, pg. 61). At the hearing, Plaintiff's knee pain was an 8 or 9 out of 10. (Doc. 13-2, pg. 61). To manage the knee pain, Plaintiff must alternate between sitting and standing. (Doc. 13-2, pg. 61).

With respect to his right arm, Plaintiff testified, "[i]f I try to use it to do anything[,] it starts to tighten up." (Doc. 13-2, pg. 62). Plaintiff's "whole hand will just lock" for 5 to 10 minutes. (Doc. 13-2, pg. 62). When this happens, Plaintiff can pick up a gallon of water, but he cannot open a jar. (Doc. 13-2, pg. 62). He would not last an hour if he had to pick up a gallon of water every five minutes. (Doc. 13-2, pg. 63).

In relation to his feet, Plaintiff testified to "constant, sharp[,] needle pains that feel like [his feet are] on fire." (Doc. 13-2, pg. 63). There are times when Plaintiff must "stop doing everything just to pull [his] foot off the floor…to hold it there until it stops." (Doc. 13-2, pg. 62). Sometimes, the pain prevents Plaintiff from standing. (Doc. 13-2, pg. 63). On

17

a good day, the pain occurs ten times. (Doc. 13-2, pg. 63). On a bad day, which occurs a couple of times a week, the pain occurs about 20 times. (Doc. 13-2, pg. 63). Plaintiff testified that the pain may last 1 to 2 minutes or 5 to 10 minutes. (Doc. 13-2, pgs. 63-64).

Plaintiff spends his time at home, not doing much. (Doc. 13-2, pg. 66). If he can, Plaintiff tries to wake up and clean. (Doc. 13-2, pg. 66). Plaintiff has three children living in the home. (Doc. 13-2, pg. 65). Plaintiff cooks for his children. (Doc. 13-2, pg. 66). However, they help clean because Plaintiff cannot do much. (Doc. 13-2, pg. 66). They also help fix meals, wash dishes, do laundry, and shop. (Doc. 13-2, pgs. 66-67). Sometimes Plaintiff takes a chair into the kitchen so he can sit while cooking. (Doc. 13-2, pg. 66).

Plaintiff does not engage in hobbies or social activities due to his anxiety. (Doc. 13-2, pg. 67). Over the past few years, Plaintiff feels anxious around a lot of people, requiring him to walk off to be alone.  (Doc. 13-2, pg. 67). Further, Plaintiff wears glasses, which "[k]ind of" allow him to see well enough to do everyday activities. (Doc. 13-2, pg. 72). Plaintiff noted "[t]hey can only correct my vision to 20/40." (Doc. 13-2, pg. 72). In order to read, Plaintiff must hold the material "[j]ust inches from [his] face." (Doc. 13-2, pg. 72).

The ALJ received testimony from a Vocational Expert ("VE"). (Doc. 13-2, pgs. 41, 73-80). The ALJ engaged the VE in various hypotheticals. (Doc. 13-2, pgs. 75-79). The VE assumed a younger individual with a limited education who could not engage in his past work. (Doc. 13-2, pg. 75). The individual could perform unskilled, sedentary work, occasionally requiring pushing and pulling with the bilateral lower extremities, climbing ramps and stairs, stooping, kneeling, crouching, and crawling. (Doc. 13-2, pgs. 75, 77). The individual could not climb ladders, ropes, or scaffolds and was to avoid concentrated

exposure to certain environmental elements and hazards. (Doc. 13-2, pgs. 75-76). The individual could work with large and small objects but, with very small objects, such as needles or those with small print, the individual needed to hold the object six inches from his eyes. (Doc. 13-2, pg. 76). The individual could frequently reach, handle, and perform fine finger manipulation with the right upper extremity. (Doc. 13-2, pg. 77). The VE opined that this individual could perform the work of a cuff folder (10,000 jobs in the national economy), table worker (16,000 jobs in the national economy), and circuit board assembler (21,000 jobs in the national economy). (Doc. 13-2, pg. 77).

## III. Legal Standards

To qualify for DIBs or SSI, a claimant must be disabled. To assess an alleged disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. §§ 404.1520(a)(1), (2), (4); 416.920(a)(1), (4). The ALJ inquires into whether: (1) the claimant is doing substantial gainful activity; (2) the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) the claimant has an impairment that meets or equals one of the impairments listed in the regulations and satisfies the duration requirements; (4) in view of the claimant's RFC and past relevant work, he or she can perform past relevant work; and (5) in view of the claimant's RFC, age, education, and work experience, he or she can adjust to other work.[4]

---

[4]At step 3, most mental impairment listings require at least two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See Thompson v. Saul*, 470 F. Supp. 3d 909, 912 (E.D. Wisc. 2020).

*See* 20 C.F.R. §§ 404.1520(a)(4), (b), (c), (d), (e), (f), (g); 416.920(a)(4), (b), (c), (d), (e), (f), (g); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant is doing substantial gainful activity under step 1, does not have an impairment or combination of impairments as described at step 2, can perform past relevant work under step 4, or can adjust to other work under step 5, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i),(ii), (iv), (v); 416.920(a)(4)(i), (ii), (iv), (v). If the claimant has an impairment that meets the requirements of step 3 or is incapable of adjusting to other work under step 5, then he or she is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (v); 416.920(a)(4)(iii), (v). The claimant has the burden of proof at steps 1 to 4. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At step 5, the burden of proof shifts to the Commissioner of Social Security to show that the claimant can adjust to other work existing in "a significant number of jobs…in the national economy." *See Young*, 362 F.3d at 1000; *accord Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

A claimant's impairments and related symptoms may cause physical and mental limitations that affect the ability to work. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC at steps 4 and 5 assesses the most a claimant can do at work, despite the limitations. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n. 7 (7th Cir. 2000). In this way, an RFC is an assessment of the ability to perform sustained work-related physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and five days a week or an equivalent schedule. *See Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

An RFC must be based on all the relevant medical and other evidence of record. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

When completing an RFC, the ALJ considers all impairments, including nonsevere impairments, and the claimant's ability to meet physical, mental, sensory, and other requirements of work.[5] [6] *See* 20 C.F.R. §§ 404.1545(a)(2), (4); 416.945(a)(2), (4); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("[T]he ALJ must consider the combined effect of all impairments, 'even those that would not be considered severe in isolation.' "). After identifying the claimant's functional limitations and assessing his or her work abilities on a function-by-function basis, the RFC may be expressed by exertional category, *i.e.*, "sedentary."[7] *See Tenhove*, 97 F. Supp. 2d at 569; *accord Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1036 (E.D. Wisc. 2004); SSR 96-8p, 1996 WL 374184, *3. To do a full range of work in an exertional category, the claimant must be able to perform substantially all of the functions at that level. *See* SSR 96-8p, 1996 WL 374184, *5-6.

## IV. The ALJ's Decision

The ALJ assessed the alleged disability under the five-step sequential evaluation

---

[5] "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a); 416.922(a).

[6] A limited ability to perform physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, or crouching may reduce the ability to do "other work" at step 5. *See* 20 C.F.R. §§ 404.1545(b); 416.945(b); *see also* SSR 96-8p, 1996 WL 374184, *5-6. A limited ability to do certain mental activities, such as understand, remember, carry out instructions, and respond appropriately to supervision, co-workers, and work pressures, may reduce the ability to do "other work" at step 5. *See* 20 C.F.R. §§ 404.1545(c); 416.945(c). Other impairments affecting work abilities include, among other things, impairments of vision. *See* 20 C.F.R. §§ 404.1545(d); 416.945(d).

[7] Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a); 416.967(a). A sedentary job involves sitting but often has a certain amount of walking and standing necessary to its related duties. *See* 20 C.F.R. §§ 404.1567(a); 416.967(a). Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are satisfied. *See* 20 C.F.R. §§ 404.1567(a); 416.967(a).

process. At step one, Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. (Doc. 13-2, pg. 18). At step 2, Plaintiff had the following severe limitations in the ability to perform basic work activities: (1) lumbar and thoracic spine degenerative disc disease; (2) bilateral knee malalignment syndrome; (3) bilateral acetabular dysplasia; (4) hypermetropia, astigmatism, and amblyopia; (5) hypertension; (6) neuropathy of the feet; (7) right upper extremity carpal tunnel and ulnar neuropathy; (8) type 2 diabetes mellitus; and (9) level two obesity. (Doc. 13-2, pg. 19).

The ALJ noted, at step 2, there was evidence of Plaintiff contending with other nonsevere impairments. (Doc. 13-2, pg. 19). For example, in relation to Plaintiff's medically determinable mental impairments of generalized anxiety disorder with panic attacks, which were considered singly and in combination, the ALJ found those mental impairments were nonsevere because they did not cause more than minimal limitations in Plaintiff's ability to perform basic mental work activities. (Doc. 13-2, pgs. 19, 28).

To arrive at this finding, the ALJ considered the "paragraph B" criteria. *See Thompson*, 470 F. Supp. 3d at 912. (Doc. 13-2, pg. 19). At the first "paragraph B" criterion, the ALJ reasoned, while Plaintiff reported conditions affecting his concentration, completion of tasks, understanding, and ability to follow spoken instructions, Plaintiff could follow written instructions and he performed within the expected range on the consultative mental status examination. (Doc. 13-2, pg. 19). Plaintiff was also alert and oriented to person, place, and time. (Doc. 13-2, pg. 19). He had an intact memory and could recall three items, complete a brief inference task and the "serial sevens" task, and perform other basic mathematical calculations. (Doc. 13-2, pgs. 19-20).

Further, Plaintiff's daily activities did not indicate more than minimal limitations, as he did not need reminders to take medication or conduct personal care and he prepared simple meals, washed dishes, did laundry with his son, drove a car, paid bills, maintained bank accounts, and shopped for groceries. (Doc. 13-2, pg. 20). Despite a slight deficit, the ALJ found a functional limitation of not more than minimal or mild. (Doc. 13-2, pg. 20).

At the second "paragraph B" criterion, the ALJ noted Plaintiff's claim that it was difficult to get along with family, friends, and neighbors. (Doc. 13-2, pg. 20). However, Plaintiff lives with his girlfriend and three young children. (Doc. 13-2, pg. 20). He takes care of his children by waking them up for school, cooking their meals, doing laundry with his son, and attending doctors' appointments. (Doc. 13-2, pg. 20). The ALJ noted that Plaintiff's ability to get along with authority figures is dependent upon his level of physical pain, depression, and anxiety. (Doc. 13-2, pg. 20). But he has never been fired due to an inability to get along with others. (Doc. 13-2, pg. 20). Further, according to treatment records, Plaintiff took medication that helped the symptoms of depression and anxiety. (Doc. 13-2, pg. 20). While he appeared anxious at the consultative mental status examination, the affect was within the normal limits of range, intensity, and congruency. (Doc. 13-2, pg. 20). Plaintiff could independently, appropriately, and effectively interact with others on a sustained basis, as there was no evidence of fights, evictions, fear of strangers, isolation, or social avoidance. (Doc. 13-2, pg. 20). The evidence did not support a finding of more than a slight deficit and mild limitation in this area. (Doc. 13-2, pg. 20).

At the third "paragraph B" criterion, the ALJ noted Plaintiff reported conditions affecting his ability to concentrate and complete tasks. (Doc. 13-2, pg. 20). Plaintiff could

pay attention, depending on the task, but had difficulties understanding and following spoken instructions. (Doc. 13-2, pg. 20). However, the ALJ noted Plaintiff could follow written instructions and, as previously mentioned, his performance on the consultative mental status examination was within the expected range. (Doc. 13-2, pg. 20). In addition to the results discussed above with respect to the first "paragraph B" criterion, the ALJ noted that Plaintiff's insight and judgment were fair, rate of speech was normal, and he had no noticeable problems with gait or fine-motor control. (Doc. 13-2, pgs. 19-20). The ALJ found there was no evidence that Plaintiff needed extra supervision, assistance, or unreasonable rest time or disruptions. (Doc. 13-2, pgs. 20-21). As such, the ALJ found only a slight deficit and not more than a mild limitation in this area. (Doc. 13-2, pgs. 20-21).

At the fourth "paragraph B" criterion, the ALJ noted Plaintiff reported not handling stress well. (Doc. 13-2, pg. 21). Similarly, his ability to tolerate change depended on the extent of the changes. (Doc. 13-2, pg. 21). Plaintiff reported not bathing for days due to depression, but he otherwise adapted and managed. (Doc. 13-2, pg. 21). The ALJ found Plaintiff could mostly manage day-to-day schedules. (Doc. 13-2, pg. 21). Further, Plaintiff took care of his personal needs, such as grooming, money management, grocery shopping, cooking simple meals, and driving a car. (Doc. 13-2, pg. 21). Usually, he finishes what he starts. (Doc. 13-2, pg. 21). The ALJ found Plaintiff can do these things despite his physical and mental conditions. (Doc. 13-2, pg. 21). Therefore, the ALJ found the evidence supported a slight deficit and not more than a minimal limitation in this area. (Doc. 13-2, pg. 21). Since Plaintiff's medically determinable mental impairments caused no more than mild limitations under the "paragraph B" criteria and the evidence

did not indicate there was more than minimal limitations on the ability to do basic work activities, the ALJ found the mental impairments were nonsevere. (Doc. 13-2, pg. 21).

Returning to step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the regulations. (Doc. 13-2, pg. 21). Before proceeding to step 4, the ALJ found Plaintiff had an RFC to perform sedentary work, with the exception of the occasional ability to push and pull with the bilateral lower extremities. (Doc. 13-2, pg. 22). Plaintiff could also occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds. (Doc. 13-2, pgs. 22-23). Plaintiff could occasionally stoop, kneel, crouch, and crawl. (Doc. 13-2, pg. 23). Plaintiff could work with large or small objects, but when working with very small objects he required the ability to hold the object as close as six inches from his eyes. (Doc. 13-2, pg. 23). Plaintiff could frequently reach, handle, and perform fine finger manipulation with the right upper extremity. (Doc. 13-2, pg. 23).

The ALJ elaborated on its process for considering Plaintiff's symptoms, including his pain, in the RFC. *See* 20 C.F.R. §§ 404.1529; 416.929; (Doc. 13-2, pg. 23). The ALJ described Plaintiff's household activities, typical day, and the reported effects of his conditions, including his pain. (Doc. 13-2, pgs. 23-24). The ALJ then found Plaintiff's medically determinable impairments could reasonably be expected to cause his symptoms. (Doc. 13-2, pg. 24). However, Plaintiff's statements concerning the intensity, persistence, and limiting effects of his reported symptoms were inconsistent with the medical and other evidence of record, which "detract[ed] from the subjective allegations." (Doc. 13-2, pg. 24). That is, the evidence generally did not support Plaintiff's

alleged loss of functioning. (Doc. 13-2, pg. 24). His allegations were greater than expected in view of the objective clinical evidence and treatment notes. (Doc. 13-2, pg. 24).

For example, the ALJ found the objective signs, diagnostic imaging, and laboratory findings supported type 2 diabetes mellitus, degenerative disc disease, and neuropathy, but the evidence did not support Plaintiff's alleged degree of limitation. (Doc. 13-2, pg. 24). Similarly, x-rays, an MRI, and other examinations showed lumbar and thoracic degenerative change, reduced leg strength, and decreased sensation in both feet. (Doc. 13-2, pg. 24). Plaintiff walked with an antalgic gait and reported that Gabapentin did not assist with the pain. (Doc. 13-2, pg. 24). An eye examination demonstrated a visual acuity of, at best, 20/40 with glasses. (Doc. 13-2, pg. 24). Despite these things, the ALJ noted Plaintiff did not use an assistive walking device, he could ambulate for 50 feet, he obtained relief from marijuana, and he drove a vehicle. (Doc. 13-2, pg. 24). While the combined effects of obesity and chronic physical impairments affected his functional abilities, Plaintiff's daily living activities also showed he could perform light exertional work and there was no objective examination findings supporting a greater functional limitation. (Doc. 13-2, pg. 27). The symptoms of depression and anxiety were nonsevere and caused minimal limitations. (Doc. 13-2, pg. 24). Overall, the evidence of physical and mental conditions suggested Plaintiff could perform light work. (Doc. 13-2, pgs. 24-28).

Further, the ALJ emphasized it "fully considered the medical opinions and prior administrative medical findings." (Doc. 13-2, pg. 28). The ALJ discussed its consideration of the State agency medical consultants, including Drs. Mikell and Chang for Plaintiff's physical condition and Drs. DiFonso and Hamersma for Plaintiff's mental condition.

(Doc. 13-2, pgs. 28-29). The ALJ found Dr. Mikell's initial prior administrative medical finding was more persuasive than that of Dr. Chang at reconsideration, as Dr. Mikell accounted for the "difficulty with prolonged visual work or very fine vision." (Doc. 13-2, pgs. 28-29). The ALJ found Dr. Mikell's finding was "consistent with the claimant's limited near and far acuity and depth perception bilaterally, which corrects with glasses to only 20/70." (Doc. 13-2, pgs. 28-29). Dr. Chang "removed the visual limitations, but retained the remaining limitations." (Doc. 13-2, pg. 28). As such, Drs. Mikell and Chang's prior administrative medical findings were "partially persuasive." (Doc. 13-2, pg. 29).

The ALJ reasoned that Plaintiff was found to have orthopedic impairments, neuropathy in his feet, and obesity, which supported a conclusion that Plaintiff could function more easily seated than while standing and walking. (Doc. 13-2, pg. 29). The record evidence did not support a conclusion that Plaintiff could not perform sedentary work. (Doc. 13-2, pg. 29). Likewise, Plaintiff's allegation that, after minimal use, his right hand locked, was unsupported. (Doc. 13-2, pg. 29). Plaintiff's pinch, arm, and grip strength remained normal, and he could oppose his thumb to each finger despite carpal tunnel syndrome. (Doc. 13-2, pg. 29). Therefore, the manipulative limitations did not support a greater limitation than that stated in the RFC. (Doc. 13-2, pg. 29).

With respect to Drs. DiFonso and Hamersma, whose prior administrative medical findings related to Plaintiff's mental condition, the ALJ noted each doctor found Plaintiff's mental impairments caused mild limitations under the "paragraph B" criteria. (Doc. 13-2, pg. 29). Therefore, Plaintiff's mental impairments were nonsevere. (Doc. 13-2, pg. 29). Each prior administrative medical finding was persuasive, consistent with the

unremarkable mental status examinations, and supported by the evidence that medication improved Plaintiff's symptoms. (Doc. 13-2, pg. 29). The ALJ emphasized that its RFC assessment was supported by the entire record. (Doc. 13-2, pg. 29).

At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (Doc. 13-2, pg. 29). At step five, the ALJ noted that Plaintiff's ability to perform all or substantially all of the requirements of sedentary work was impeded by additional limitations. (Doc. 13-2, pg. 30). Therefore, to determine the extent to which those limitations eroded the unskilled sedentary occupational base, the ALJ relied upon its questioning of the VE about jobs existing in the national economy for an individual like Plaintiff. (Doc. 13-2, pgs. 30-31). The ALJ noted that such an individual would be able to perform the requirements of representative occupations, such as cuff folder (a sedentary, unskilled occupation with 10,000 jobs in the national economy), table worker (a sedentary, unskilled occupation with 16,000 jobs in the national economy), and printed circuit board assembler (a sedentary, unskilled occupation with 21,000 jobs in the national economy). (Doc. 13-2, pg. 31). Thus, the ALJ concluded Plaintiff could successfully adjust to other work, existing in significant numbers, in the national economy. (Doc. 13-2, pg. 31). Accordingly, a finding of "not disabled" was appropriate. (Doc. 13-2, pg. 31).

For these reasons, the ALJ concluded Plaintiff was not disabled from June 1, 2018, through May 6, 2021, which was the date of its decision. (Doc. 13-2, pgs. 17, 31). As a result, Defendant denied Plaintiff's applications for DIBs and SSI. (Doc. 13-2, pg. 31).

## V. Analysis

The Court's review of the ALJ's decision is "extremely limited" and "very

deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022)

(quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by

substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869.

The Court will reverse the ALJ's decision only if the findings of fact were not supported

by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d

at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "Substantial evidence means

'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.' " *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401

(1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ about the

alleged disability and the ALJ's decision is supported by substantial evidence, the Court

will affirm the denial of claims. *See Jarnutowski*, 48 F.4th at 773 (quoting *Elder*, 529 F.3d at

413). The Court reviews the entire record, but does not reweigh the evidence, resolve

conflicts, decide credibility, or substitute its judgment for that of the ALJ. *See Clifford*, 227

F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However,

an ALJ must build a logical bridge between the evidence and the conclusions.

*See Jarnutowski*, 48 F.4th at 773 (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)).

Now, Plaintiff presents three main arguments for the Court's consideration in this

case. Each argument is addressed separately below.

### A. The RFC Assessment

First, Plaintiff argues the ALJ's RFC assessment was not supported by substantial

evidence. (Doc. 21, pgs. 2-4). Plaintiff states, while the ALJ's decision summarizes some

medical evidence, it fails to explain how that evidence supports the RFC assessment.

(Doc. 21, pg. 3). Specifically, Plaintiff asserts that, in addition to analyzing his depression and anxiety, the ALJ was required to consider the effect of mild mental limitations, alone and coupled with physical impairments, on the ability to work. (Doc. 21, pg. 3). Plaintiff notes the ALJ did not include any mental limitations in his RFC. (Doc. 21, pg. 3).

"While a mild…limitation in an area of mental functioning does not *necessarily* prevent an individual from securing gainful employment, [citation], the ALJ must still affirmatively *evaluate* the effect such mild limitations have on the claimant's RFC." *See Simon–Leveque v. Colvin*, 229 F. Supp. 3d 778, 783 (N.D. Ill. 2017) (citing *Sawyer v. Colvin*, 512 Fed. Appx. 603, 611 (7th Cir. 2013)) (Emphasis in original). The Court **FINDS** the ALJ did that here, and Plaintiff's assertions to the contrary mischaracterize the ALJ's decision.

Here, the ALJ noted Plaintiff's nonsevere impairments, including the medically determinable mental impairments of generalized anxiety disorder with panic attacks. (Doc. 13-2, pg. 19). The mental impairments, which were considered singly and in combination, were nonsevere because they did not cause more than minimal limitations in the ability to perform basic mental work activities. (Doc. 13-2, pgs. 19, 28). The ALJ explained, in painstaking detail, how he arrived at this finding under the "paragraph B" criteria. *See Thompson*, 470 F. Supp. 3d at 912. (Doc. 13-2, pgs. 19-21). Further, the ALJ explained all medically determinable impairments, including those that were nonsevere, were considered in the RFC. (Doc. 13-2, pgs. 19, 24-29). The RFC "assessment reflect[ed] the degree of limitation…in the 'paragraph B' mental function analysis." (Doc. 13-2, pgs. 21, 24-29). The Court has summarized the ALJ's explanations and its consideration of the evidence above, and it will not repeat itself here. (Doc. 13-2, pgs. 19-21). However, the

Court emphasizes that this case is not like *Craft v. Astrue*, where "the RFC was for 'unskilled' work, which *by itself* d[id] not provide any information about…mental condition or abilities." *See* 539 F.3d 668, 677 (7th Cir. 2008) (Emphasis added.). Here, the RFC was for "unskilled" work but, again, the ALJ discussed the ways in which Plaintiff could "understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting." *See id.* (citing 20 C.F.R. § 404.1545(c); SSR 85-15); (Doc. 13-2, pgs. 19-21).

Therefore, the Court **FINDS** the ALJ adequately discussed its RFC assessment, including the effect of all Plaintiff's mental limitations, and the support for that RFC in the evidence. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013) (holding the ALJ's discussion of the RFC was adequate, despite the plaintiff's argument that "the ALJ 'merely summarized some of the medical evidence without assessment or discussion specifying how the medical and other evidence supported his conclusions,' " where, *inter alia*, the ALJ provided a lengthy discussion of the medical records and plaintiff's testimony on the alleged impairments before concluding each impairment supported the light work limitation), *compare Simon–Leveque*, 229 F. Supp. 3d at 783 (finding the ALJ failed to explain why the evidence did not require nonexertional limitations in an RFC).

For these reasons, the Court **CONCLUDES** the ALJ's RFC assessment was based on substantial evidence and not an erroneous legal standard.

### B. The Medical Opinions of Record

Second, Plaintiff argues the ALJ improperly considered the medical opinions of record. (Doc. 21, pgs. 4-9). Plaintiff argues, in relation to each doctor's prior

administrative medical findings, the ALJ failed to address the supportability and consistency factors. (Doc. 21, pg. 7). Plaintiff also notes perceived inconsistencies in the ALJ's conclusions related to the prior administrative medical findings of Drs. Mikell and Chang, as well as the fact that the ALJ did not evaluate Dr. Riley's opinion at all. (Doc. 21, pgs. 5-6). Finally, Plaintiff alleges "new" evidence, obtained after the initial and reconsideration decisions, would have impacted the doctors' prior administrative medical findings.[8] (Doc. 21, pgs. 6-7). Plaintiff takes issue with the ALJ's evaluation of that evidence, allegedly without a review by a physician. (Doc. 21, pgs. 7-8).

Now, when medical sources provide prior administrative medical findings, an ALJ must consider each of those findings together with certain enumerated factors. *See* 20 C.F.R. §§ 404.1520c(a), (b), (c); 416.920c(a), (b), (c). The most important factors for evaluating the persuasiveness of prior administrative medical findings are supportability and consistency. *See id*. §§ 404.1520c(a), (b)(2), (c)(1)-(2); 416.920c(a), (b)(2), (c)(1)-(2). Therefore, at a minimum, an ALJ must explain its consideration of those two factors.[9] *See Christina S. v. Comm'r of Soc. Sec.*, No. 21-261, 2023 WL 2553928, *3 (N.D. Ind. March 17, 2023) (quoting 20 C.F.R. § 404.1520c(b)(2)). The failure to adequately discuss these factors requires a remand. *See id.* (quoting *Willis v. Acting Comm'r of Soc. Sec.*, No. 21-178,

---

[8]As best the Court can glean from his brief, Plaintiff is specifically referring, in part, to the medical records from December 1, 2020 (x-rays assessed by Dr. Freehill at the Orthopaedic Center of Southern Illinois), December 11, 2020 (MRI that was subsequently assessed by Dr. Freehill and Jamie Smith, MSN, FNP, of the Orthopaedic Center of Southern Illinois), and April 8, 2021 (Report of Nerve Conduction Study and EMG by Dr. Nemani). (Docs. 21, pg. 6; 13-7, pgs. 278, 284, 295).

[9]The more relevant the objective medical evidence and supporting explanations presented by a medical source are to *support* his or her medical opinions, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). The more *consistent* medical opinions are with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).

2022 WL 2384031, *3 (N.D. Ind. July 1, 2022)). Although the ALJ "need only 'minimally articulate' " its reasoning when assessing a medical opinion, the ALJ "must still consider the regulatory factors and build a 'logical bridge' from the evidence to his conclusion." *See id*. (quoting *Taylor v. Kijakazi*, No. 22-32, 2023 WL 334601, *3 (N.D. Ind. Jan. 20, 2023)).

Here, before addressing the prior administrative medical findings, the ALJ extensively detailed all of the evidence. (Doc. 13-2, pgs. 23-28). Then, with respect to Drs. Mikell and Chang, the ALJ found each doctor's prior administrative medical findings to be "partially persuasive." (Doc. 13-2, pg. 29). With respect to Plaintiff's vision, which was the only differing limitation between the two doctors, Dr. Mikell's initial findings were "more persuasive" than those of Dr. Chang on reconsideration. (Doc. 13-2, pg. 28). Dr. Mikell's findings were "consistent with the claimant's limited near and far acuity and depth perception bilaterally, which corrects with glasses to only 20/70." (Doc. 13-2, pgs. 28-29). Further, Plaintiff's orthopedic impairments, neuropathy in his feet, and obesity, "support[ed] a conclusion that the claimant could function more easily seated than while standing and walking." (Doc. 13-2, pg. 29). The record did not show Plaintiff was unable to perform sedentary work. (Doc. 13-2, pg. 29). To the extent there was an inconsistency between Drs. Mikell and Chang, based on differing opinions as to Plaintiff's ability to stand and/or walk in a workday, the ALJ clearly found the evidence supported sedentary work. (Docs. 13-2, pg. 29; 13-3, pgs. 8, 38). Finally, in view of Plaintiff's pinch, arm, and grip strength, and his ability to oppose his thumb to each finger despite carpal tunnel syndrome, the record did not support hand locking after minimal use. (Doc. 13-2, pg. 29).

Relating to Drs. DiFonso and Hamersma, the ALJ found each doctor's prior

administrative medical findings were "persuasive." (Doc. 13-2, pg. 29). Each doctor found Plaintiff's mental impairments caused mild limitations under the "paragraph B" criteria and, thus, were nonsevere. (Doc. 13-2, pg. 29). The prior administrative medical findings were noted as "most consistent" with the unremarkable mental status examination and supported by the evidence of improved symptoms with medication. (Doc. 13-2, pg. 29).

Therefore, the Court **FINDS** the ALJ adequately discussed the supportability and consistency factors in relation to the prior administrative medical findings of Drs. Mikell, Chang, DiFonso, and Hamersma. *See Willis*, No. 21-178, 2022 WL 2384031, *3 (the ALJ's "general statements" about the consistency of medical opinions, when compared to the evidence, were "not enough," where "the ALJ simply provided her end result…*without giving any indication of which specific evidence she considered in coming to those conclusions*) (Emphasis added.). The Court recognizes, though, the ALJ failed to mention, let alone apply the regulatory factors to, Dr. Riley's prior administrative medical findings, relating only to Plaintiff's vision. However, the Court **FINDS** this error was harmless. Dr. Riley believed the visual impairment was nonsevere and had a minimal impact on functioning. (Doc. 13-3, pg. 34). This stands in contrast to Dr. Mikell's prior administrative medical findings, which were more limiting and found to be "consistent with the claimant's limited near and far acuity and depth perception bilaterally." (Doc. 13-2, pg. 28-29; 13-3, pgs. 9-10). As such, the Court is "convinced that the ALJ would reach the same result on remand." *See Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)); *see also Schomas v. Colvin*, 732 F.3d 702, 707-08 (7th Cir. 2013) (stating, in response to argument that the ALJ's silence as to the controlling

34

weight of one assessment over another, was the "kind of error [that] is subject to harmless-error review, and we will not remand a case to the ALJ for further explanation if we can predict with great confidence that the result on remand would be the same.").

Next, the Court notes the "new" evidence noted by Plaintiff was not actually "new" evidence, as that term is defined in the case law. *See Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005) ("Evidence is 'new' if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' [Citation]."). All of the noted evidence was in existence and available to Plaintiff as of the hearing date, April 27, 2021. Nevertheless, the Court understands Plaintiff's point that additional evidence was received by Plaintiff subsequent to the administrative medical findings of Drs. Mikell, DiFonso, Chang, Riley, and Hamersma. (Doc. 21, pgs. 6-7). When this is the case, an ALJ may rely on a reviewing physician's assessment unless the subsequent evidence, containing new and significant medical diagnoses, changed the picture so much that it could reasonably change the reviewing physician's opinion. *See Massaglia v. Saul*, 805 Fed. Appx. 406, 410 (7th Cir. 2020) (quoting *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016)); *accord Marilyn C. v. Kijakazi*, No. 20-1816, 2023 WL 1862988, *13 (N.D. Ill. Feb. 9, 2023).

Here, the ALJ summarized and considered all of the evidence noted by Plaintiff before assessing the prior administrative medical findings. (Doc. 13-2, pgs. 25, 27). Further, the ALJ did not "play doctor," by interpreting the medical evidence on its own. *See McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). To the contrary, in its discussion of the evidence, the ALJ relied on the assessments contained in the records of Plaintiff's treating physicians. (Docs. 13-2,

pgs. 25, 27). For example, the x-rays obtained on December 1, 2020, were assessed by Dr. Freehill, who stated "I personally reviewed these x-rays and these are my findings." (Doc. 13-7, pg. 285). The MRI obtained on December 11, 2020, was reviewed by both Jamie Smith, MSN, FNP, and Dr. Freehill, who again noted "I personally reviewed these x-rays and these are my findings." (Docs. 13-7, pgs. 278, 281). The Report of Nerve Conduction Study and EMG of Dr. Nemani included a summary and supported diagnoses. (Doc. 13-7, pg. 295). For these reasons, the Court **FINDS** the ALJ did not err in its consideration of or reliance on the prior administrative medical findings after discussing all of the record evidence. *See Marilyn C.*, No. 20-1816, 2023 WL 1862988, *13 (the ALJ did not commit reversible error by relying on the state-agency physicians' opinions, despite later evidence that the plaintiff's vision worsened before improving and stabilizing, where "the ALJ carefully considered the evidence [that] the state-agency physicians did not review and [then] reasonably concluded that the physicians' assessments [we]re consistent with the record as a whole."); *Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022) (noting, while the plaintiff claimed testing rendered prior medical opinions stale, the results of that testing, as interpreted by the plaintiff's physicians and not the ALJ, did not reveal a worsening condition that required resubmission to a medical expert).

For these reasons, the Court **CONCLUDES** that the ALJ did not err in its consideration of the medical opinions of record.

### C. Plaintiff's Subjective Complaints of Pain

Third, Plaintiff argues the ALJ improperly considered his subjective complaints of pain. (Doc. 21, pgs. 9-12). Plaintiff notes the ALJ never found his severe impairments were

36

not reasonably expected to produce pain and the medical records note his complaints of pain. Further, the ALJ concluded Plaintiff performed light exertional work around the house but did not explain how that work was inconsistent with the complaints of pain. (Doc. 21, pg. 11). Plaintiff argues the ALJ dismissed his subjective complaints of pain and made findings that were not supported by substantial evidence. (Doc. 21, pgs. 10-12).

The Court may overturn a credibility finding only if it was "patently wrong." *See Pepper*, 712 F.3d at 367 (quoting *Craft*, 539 F.3d at 678). But an ALJ must "adequately explain his credibility finding by discussing specific reasons supported by the record." *See id*. at 367 (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)). Factors relied upon by the ALJ in this analysis, which must be based on "the entire case record," include the claimant's daily activities, level of pain or symptoms, precipitating and aggravating factors, medication, treatment and measures of relief, and other limitations. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Simon–Leveque*, 229 F. Supp. 3d at 790-91; 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3). Statements of pain or other symptoms are considered, but they are not conclusive of a disability. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529(a); 416.929(a). However, a claimant's testimony about pain and limitations may not be discredited solely because there is no objective medical evidence supporting the testimony. *See Villano*, 556 F.3d at 562 (citing 20 C.F.R. § 404.1529(c); S.S.R. 96-7p; *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Clifford*, 227 F.3d at 871-72).

Here, in its RFC assessment, the ALJ summarized its process for considering Plaintiff's symptoms, including pain. (Doc. 13-2, pg. 23). The ALJ also summarized, in detail, Plaintiff's reported effects of conditions, activities of daily living, hearing

testimony, diagnostic imaging, laboratory findings, treatment records and assessments, diagnoses, attempts at treatment through physical therapy, prescriptions, and aggravating factors. (Doc. 13-2, pgs. 23-27). All along the way, the ALJ detailed his subjective complaints of pain. (Doc. 13-2, pgs. 23-27). However, after this thorough review of the record, the ALJ found Plaintiff's statements about his symptoms were "not entirely consistent" with the evidence. (Doc. 13-2, pg. 24). Those statements did not support Plaintiff's alleged loss of functioning, as his allegations were "greater than expected in light of the objective clinical evidence and treatment notes." (Doc. 13-2, pg. 24). The inconsistencies "detract[ed] from [his] subjective allegations." (Doc. 13-2, pg. 24).

Critically, the ALJ provided examples of these inconsistencies. (Doc. 13-2, pgs. 24-25). Despite the record evidencing certain impairments, Plaintiff did not require the use of an assistive device to walk, he could ambulate for 50 feet, marijuana helped with his pain, and he could drive. (Doc. 13-2, pg. 24). Further, Plaintiff's activities of daily living, which have been discussed extensively in this Memorandum & Order, demonstrated he could and did "perform light exertional level work." *See Pepper*, 712 F.3d at 369 ("The ALJ concluded that, taken together, the amount of daily activities [the plaintiff] performed, the level of exertion necessary to engage in those types of activities, and the numerous notations in [the plaintiff's] medical records regarding her ability to engage in activities of daily living undermined [her] credibility when describing her subjective complaints of pain and disability," which were "exactly the type of factors the ALJ was required to consider"). (Doc. 13-2, pg. 27). Also, there was "no objective exam findings to support [a] greater functional limitation." (Doc. 13-2, pg. 27). Therefore, the Court **FINDS** the ALJ

adequately explained its credibility finding, which was not "patently wrong" under the factors articulated in the regulations and case law. *See Pepper*, 712 F.3d at 368 (holding the ALJ sufficiently justified its credibility finding, where, despite some "boilerplate," the ALJ discussed the plaintiff's testimony in conjunction with the RFC statement, noted the plaintiff's physical abilities fell within the light work category, described the plaintiff's testimony on her daily activities and the exacerbation of pain and symptoms from sitting or standing for extended periods of time or engaging in excessive bending, and discussed the plaintiff's testimony that medication was somewhat effective).

Therefore, the Court **CONCLUDES** the ALJ properly considered Plaintiff's subjective complaints of pain and rendered findings supported by substantial evidence.

## VI. Conclusion

For these reasons, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk of the Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: March 31, 2023.

DAVID W. DUGAN
United States District Judge